[Crim. No. 4949. Second Dist., Div. One. Aug. 11, 1953.]

THE PEOPLE, Respondent, v. VINCENT CARTWRIGHT FOWLER, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, and George G. Grover, Deputy Attorney General, for Respondent.

DORAN, J.—The defendant, a physiotherapist, after a consolidated trial of informations, was convicted of two crimes of abortion. In one information, defendant was charged with having on February 4, 1952, committed the crime by providing, supplying, using and employing an instrument upon the person of Barbara Ann MacIsaac with intent to procure a miscarriage. Another information charged that on November 10, 1951, the defendant had committed a similar crime by providing, supplying, using and employing "medication and an instrument upon the person of Mrs. Bonnie Ridgeway." Defendant, at the same trial, was acquitted of a similar crime involving the use of an instrument and medication upon one Mrs. Neva Kingsley, on or about November 1, 1951.

Viewing the evidence in the light most favorable to the verdict of conviction, it appears that Mrs. MacIsaac's husband visited the defendant's office in February, 1952, and talked with the defendant about terminating Mrs. MacIsaac's pregnancy, at which time Fowler said that it would cost $250, and made an appointment for February 4, 1952. On the latter day Mrs. MacIsaac with the husband, went to the office. The defendant and Mrs. MacIsaac went into a back room where the lady got on a stirrup table and thereafter felt an instrument being inserted into the vagina by the defendant; Mrs. MacIsaac also felt some pain described as a pulling or gnawing sensation. Defendant was then called away by the door buzzer, and immediately the law enforcement officers entered the office. As this occurred, Mrs. MacIsaac got up from the table and a speculum fell out of the vagina. The patient was then bleeding from the vagina and was taken to a hospital.

Although Dr. Kieffer, who examined Mrs. MacIsaac at the hospital, was unable to testify whether or not a criminal abortion had been performed, in the doctor's written report the case was diagnosed as "attempted criminal abortion."

Other evidence includes a pan found at the table, which contained blood and placental tissue, and testimony that blood was seen on a uterine dilator and a curette found where the defendant had worked on Mrs. MacIsaac. When asked by officers whether a curette had been used on the patient, the defendant replied, "Well, you see them there don't you?" The officers had followed the MacIsaacs to defendant's office and a few minutes later entered and placed defendant under arrest. The premises were searched and no one was found save the defendant, the MacIsaacs, and the officers.

In reference to the Ridgeway information, it appears that Mrs. Ridgeway had missed one menstrual period; that Mrs. Kingsley, a sister-in-law, had telephoned the defendant who stated, "Yes, send her up," and made an appointment. On September 10, 1951, Mr. and Mrs. Ridgeway and children drove to defendant's office and Mrs. Ridgeway entered alone. There is evidence that defendant explained certain aspects of pregnancy to Mrs. Ridgeway, and said that the insertion of a capsule would cause a normal miscarriage. The defendant's fee was set at $250. Mrs. Ridgeway got up on the stirrup table and thereafter felt the defendant insert something into the vagina,—"a little pack of some sort." The patient also felt the insertion of a speculum. No one was present other than Mrs. Ridgeway and the defendant.

After the defendant had finished, Mrs. Ridgeway went home and that night suffered from cramps and bleeding. Mr. Ridgeway twice telephoned to the defendant and was advised that the patient's condition was unusual, that Mrs. Ridgeway should go to a hospital; that it would be unnecessary to pay the agreed fee, and that "you can forget about me altogether and just like you have never known me or anything like that." Mrs. Ridgeway was taken to a hospital, given a blood transfusion, and thereafter a Dr. Burns performed a curettement of the uterus, and testified to finding pregnancy tissue in the uterus and vagina.

The appellant contends that "The verdicts are contrary to the law and the evidence." ▮ In reference to the MacIsaac case, it is asserted that the evidence is insufficient to sustain the verdict, in that "There was no use of any instrument on Mrs. MacIsaacs to produce a miscarriage. A speculum

cannot be used for that purpose''; further, that ''There was no corroborative evidence of any use of any instrument to produce the miscarriage.''

An examination of the record discloses substantial evidence in support of the verdict, and no merit in reference to the above contentions. In respect to the use of an instrument, it may be noted that there is no claim on the part of the respondent that an abortion was procured by the use of the speculum. As hereinbefore indicated, a pan was found containing blood and placental tissue; blood was also seen on a uterine dilator and a curette. It appears that the appellant, when asked if a curette had been used, said, ''Well, you see them there don't you?''

The fact that there were other items of evidence, pointed out in appellant's brief, which might tend to indicate that the defendant was innocent of the charge, such as the doctor's testimony, ''I couldn't state with any degree of authority one way or another,'' whether there ''was any induced abortion in this case,'' cannot be considered ground for reversal. As in other cases, such testimony merely raises an issue of fact which the jury has resolved against appellant's contention.

As stated in the respondent's brief, ''evidence supplies ample corroboration of Mrs. MacIsaac's testimony. Further corroboration was provided by her husband. Mr. MacIsaac testified that he made arrangements with defendant for the abortion, agreeing to pay $250. . . . The conduct of defendant himself constitutes further corroboration. When told he was under arrest, he struck at the officers, and he tried to slam the door in an effort to keep them from the treatment room where he had left Mrs. MacIsaac. He never demanded payment of the fee for his services.'' It is clear that there was substantial evidence of the corpus delicti, and adequate corroborating evidence in support of the verdict of conviction.

The record, likewise, discloses evidence of a substantial nature sustaining the conviction in the Ridgeway prosecution. As in the MacIsaac case, there had been previous arrangements made with the appellant to perform an abortion; Mrs. Ridgeway felt ''something inserted into her vagina—a little pack of some 'sort','' following appellant's explanation that ''by inserting this capsule it would 'cause a normal miscarriage.' '' The later conversation in which the appellant stated that the Ridgeways could ''forget about me altogether,'' has already been referred to. As noted in respondent's brief, the victim

could not observe what was being done by the appellant, and whether the "little pack" be regarded as an instrument or as a medicine, the conviction was nevertheless proper.

The jury listened to the appellant's version of what happened and in the face of the incriminating evidence saw fit to disbelieve in the defendant's innocence. Corroborative evidence was not wanting, and the weight of the evidence presented is a matter which cannot now be reargued.

■ Appellant also complains of the admission in evidence of defendant's statement to arresting officers, "Well, you see them there, don't you?" referring to implements used in the MacIsaac case. It is alleged that "defendant had been beaten and shoved around and therefore any statements made by him were not free and voluntary and in violation of the Fourteenth Amendment." However, the record indicates that when the officers announced that defendant was under arrest, "he sought to slam the door and hit the officers," whereupon reasonable and necessary force was employed to effect the arrest, to afford protection from the attempted blows, and to prevent defendant from destroying or suppressing evidence. Defendant was merely forced to sit down in a chair. No violence was used to obtain any statements from the defendant nor was any inducement offered. Fowler's testimony was that "they broke in and grabbed me by the neck . . . and pushed me back into the chair . . . and said 'You are under arrest.' " It cannot be said that the trial court committed prejudicial error in overruling defendant's objection to this testimony.

■ Nor is reversible error apparent in the giving of instructions that "While you must consider the evidence applicable to each alleged offense . . . as though it was the only accusation . . . such evidence may be considered by you, however, as to the other alleged offenses for a limited purpose only, viz., whether said evidence tends to show that the defendant entertained the intent which is a necessary element for the alleged crimes for which he is on trial." ■ As said in *People* v. *Clapp*, 67 Cal.App.2d 197, 202 [153 P.2d 758], which involved evidence of abortions committed by means of injection of fluid, and by operation with instruments, "It is not necessary to prove that the prior crime was, in the manner of its accomplishment, identical in every detail with that on trial." Nor was there any serious time lapse between the different transactions, the Kingsley, Ridgeway and MacIsaac transactions having occurred between October, 1950 and February, 1952.

■ Appellant complains that it was error to instruct the jury in the language of section 1325 of the Penal Code, to the effect that witnesses called by the People could not thereafter be prosecuted for any crime regarding which they were required to testify. The record discloses that in the early part of the trial defendant's counsel had argued vigorously for permission to ask certain witnesses whether they had any fear of being arrested, etc., for conduct in connection with the charged abortions. At first ruling against such contention, the trial court later, at the prosecutor's request, allowed such inquiry. Defendant's counsel stated, "I think it is proper" that the jury be instructed that such witnesses are by the statute given immunity. As said in respondent's brief, "If the jury had not been so instructed, they might erroneously have believed that immunity was within the power of the District Attorney and that these witnesses were under pressure to give testimony favorable to the prosecution." No prejudicial error is apparent in the giving or the refusing of any instructions.

■ It is further argued that the above immunity statute "is unconstitutional as violative of Article IV, Section 25 (19) of the California Constitution" which prohibits the passing of "local or special laws granting . . . any special or exclusive right, privilege, or immunity," and article I, section 21, relating to the same matter; further that the statute "violates the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States."

Specifically, appellant's contention is that "The state may not single out half of the persons so connected and give them immunity if they testify and deny the other half immunity; nor may it base that immunity solely upon the fact that they are called as witnesses for the People, without giving the same right to the other defense." Appellant further claims that "No reason exists for the arbitrary classification and discrimination of a single crime, to-wit, abortion, and give anyone who is called by the prosecution immunity in order that he may be a witness in the case, even though unaccused."

The appellant's attack on the constitutionality of the immunity statute is untenable. Respondent's brief calls attention to the fact that "a criminal action is not an ordinary lawsuit between private parties"; that the district attorney, as a public officer, "has extensive powers not given to private citizens"; that the classification based upon the difference

between prosecution and defense, is, in the present instance, not unreasonable.

Nor is it objectionable that the immunity provision here involved is limited to abortion cases. As pointed out by the respondent, abortion prosecutions involve several features not common to other crimes, namely "the relative difficulty of detecting or proving the criminal conduct involved . . . for abortions are invariably committed in great secrecy and with the consent of the victim." Moreover, in abortion cases, "one of the violators is more culpable than another, or at least his conduct is more harmful to society," the latter distinction being recognized by the different penalties imposed upon a woman soliciting abortion and the person who actually provides the means of procuring a miscarriage. (See *People* v. *Buffum,* 40 Cal.2d 709, 722 [256 P.2d 317].) "It is not unreasonable, therefore," says respondent's brief, "to permit the prosecutor to allow the lesser offender to go unpunished in order to convict the. serious criminal."

The classification here employed cannot be deemed arbitrary or unreasonable; nor is there any merit in the contention that the immunity statute in question is unconstitutional on the ground that it violates the due process and equal protection provisions, or otherwise.

The record discloses that defendant was afforded a fair trial, that the convictions are supported by substantial evidence, and that no prejudicial error was committed.

The judgments are affirmed, and the orders denying the defendant's motions for new trial are likewise affirmed.

White, P. J., and Scott (Robert II.), J. pro tem., concurred.