[Crim. No. 7000.  Second Dist., Div. One.  July 19, 1960.]

THE PEOPLE, Respondent, v. ESTHER CLEMONS, Appellant.

Boags & Worrell and Claude Vibart Worrell for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

WOOD, P. J.—Esther Clemons and Joe Johnson were accused, in count 1, of conspiracy to commit the crime of abortion; and, in count 2, of committing the crime of abortion. Trial by jury was waived. They were convicted on both counts. Defendant Clemons appeals from the judgment and the order denying her motion for a new trial.

Appellant contends that the evidence was insufficient to support the verdicts; the court erred in considering the testimony of witness Vance as evidence of a conspiracy; appellant was twice in jeopardy for the same offense; the court erred in not requiring the prosecutrix to disclose identification information regarding one Jones, a participant in the alleged conspiracy; and that section 1324 of the Penal Code (exempting witness from prosecution) is unconstitutional.

Carol Emery, the prosecuting witness, testified, in substance, as follows: In December, 1958, she was in good health and she believed that she was pregnant. On December 29, 1958, about 6 p. m., she went into a bar for the purpose of meeting Joe Johnson, who was to take her to a woman "to have an abortion." Cheryl Vance went into the bar with her, and they met Johnson, Les Jones, and a Mr. Williams there. Those five persons sat at the bar. Jones, who had been her boy friend, introduced her to Johnson. Jones gave her some money. She (witness) asked Johnson "how long it would take," and he replied that "it wouldn't take very long at all." She and Johnson left the bar and went, in Johnson's automobile, to 2019 East 118th Street. When they arrived in front of the house at that address (about 10 minutes after they left the

bar), Johnson asked her if she had the money. She gave him $250, and he went into the house and returned therefrom "in about a minute." Then they went to the house, and Johnson opened the door, and they entered. Appellant met them at the door and asked her (the witness) to go with appellant. When they went into the bedroom, appellant asked the witness to take off her shoes, nylons, and pants, and to lie on the bed. Appellant left the bedroom and returned, within approximately two minutes, with a paper bag which she opened. The bag contained a green and white tube, a paste or liquid, and some prongs. Appellant inserted the prongs into the witness' private parts. She (witness) did not feel, and was not aware of, what the appellant did while she was working "about" the witness' private parts. While appellant was working, the witness asked "how long this would take," and appellant replied that she could not guarantee when it would happen, "only that it would happen" and would "come around naturally." During the conversation in the bedroom, the witness said that she was pregnant and wished to lose the baby. After she (witness) and Johnson had left the house and entered the automobile, she asked him what she should do if she "didn't come around." He wrote on the back of a card (Exhibit 1), and he told her to get in touch with him and he would get in touch with "her"; and he gave the witness the telephone number. They returned to the bar—after having been gone about 30 minutes. Three days later she (witness) removed a red "catheter tube" from inside her private parts. Two days thereafter a "small form" or fetus came out. The tube was not in her when she went to appellant's house. She became ill, went to a hospital, and received medical treatment. She had an infection in her womb. On January 12, 1959, she and Officer Mitchell went to appellant's house, and the officer told appellant that he was the witness' brother, that she had been ill and in the hospital, and they would like to get the money back. Appellant replied that she would have to talk to Johnson first, that she did not have the money there.

Cheryl Vance testified as follows: She had known Carol (prosecutrix) about two years. On December 29, 1958, she went with Carol to the bar (above referred to). Before they went there Carol said that she intended to have an abortion. After they entered the bar they sat with a Mr. Williams, and soon thereafter Jones and Johnson came in. Williams introduced Johnson. All of them sat at the bar. They discussed the abortion, but the word "abortion" was not used. Carol

asked Johnson how long it would take, and he replied that it would take about 45 minutes. Jones gave Carol $250 "to pay for the case." Then Carol and Johnson left the bar. They returned about 45 minutes later.

Officer Mitchell testified that on January 12, 1959, he and Carol went to appellant's house, and appellant invited them in. He introduced himself as the brother of Carol, and he said that Carol had been brought to appellant's house by Joe Johnson, about two weeks previously, and that appellant had put a catheter in her to cause a miscarriage and as a result Carol became ill and went to a hospital. He also said that the abortion was done improperly and that they should get their money back in order to defray the hospital expense. Appellant said that she thought they should be reimbursed but she could not return all the money, and that she would have to get in touch with Johnson. She also said that she would "get Joe Johnson up here and we'll get your money back." Appellant got up and started toward the hallway. He asked her where she was going, and she replied that she was going to call Johnson "to come up to her place." Then the witness identified himself as a police officer, and he told her she was under arrest for the crime of abortion. Two other officers came into the house, and Officer Mitchell told appellant that the officers would like to get the instruments she used to abort the girl (Carol). Appellant said that the instruments were kept at a friend's place on East 102nd Street, and that she would go with the officers to recover the instruments. The officers and appellant went in the police automobile to an address on said street, as directed by appellant. She (appellant) said that a fellow, named Jack, lived in a garage at that address and she kept her instruments there. The door at that place was locked, and they could not find Jack. Officer Mitchell asked appellant how much money she received for the abortion, and she replied that Johnson had given her $75.

Officer Bates testified that on January 13 he was with another officer who arrested Johnson at Johnson's place of business (a bar). The arresting officer asked Johnson to go into an office back of the bar. In that place the arresting officer found a piece of paper on which there was the following writing: "Clemons nurse 2019 East 118th Street." Johnson said that he did not know where the paper came from, and he did not remember anything about it.

Dick Williams, called as a witness by appellant, testified: He was acquainted with Carol, Cheryl, and Jones. On said

December 29, in the evening, he was at the bar (above referred to) with those three persons when Johnson arrived. He (witness) had an appointment to meet Johnson there regarding a horse that Johnson wanted to sell. While he (witness) was there he did not hear any discussion regarding an abortion, and he did not see Jones deliver money to anyone. Carol was intoxicated and she asked Johnson to take her some place. They left the bar, and they returned within approximately 30 minutes. Then the witness lent $20 to Johnson, who had said that he left his place of business without bringing money with him and he wanted to pay for the food and drinks which he ordered.

Appellant testified: On January 13, 1959, Officer Mitchell and a woman came to her house. She had not seen that woman previously. When the officer said that he wanted to talk to appellant, she invited him in and he asked her to call Joe Johnson. Appellant said she did not know Johnson, but she would get the telephone for the officer so that the officer could call him. When she started down the hall to get the telephone, the officer said she was under arrest. Prior to that time she did not know Johnson. The officers (Mitchell and other officers who came there) searched the house and they took her telephone books and "everything." After Officer Mitchell made a telephone call, a photographer came and took pictures of her house. She did not offer to take the officers to any place where they could find instruments. They took her in an automobile and drove to various places "around town." On December 29, 1958, about 9 a. m., appellant's daughter telephoned and said that the daughter's son had been injured. Then appellant and her husband went to the daughter's house and stayed there until approximately 2:30 p. m. Then they (appellant and husband) went to a friend's home on 55th Street where they remained until 11:30 p. m. Appellant did not have any physical contact with Carol on December 29 or at any time. Appellant did not, at any time, invite Carol into her house and have her remove any of her clothing, and she did not insert any instrument into her body.

Johnson did not testify.

Appellant asserts that the evidence was insufficient to support the verdicts (the verdicts that she was guilty of conspiracy to commit an abortion, and she was guilty of committing an abortion). Her argument with reference to this contention is mainly to the effect the "victim's testimony of the corpus delicti was insufficiently corroborated to sustain

a conviction," and therefore any alleged extrajudicial statement was inadmissible. She argues further that Carol's (the victim's) description of events is inherently "impossible," and in that connection she asserts that Carol testified to the effect that when Johnson entered appellant's house, Johnson did not say anything other than to introduce her to appellant; that she could not see appellant do anything with an instrument; that she was not aware of appellant doing anything, nor did she feel anything, nor did appellant insert anything in her private parts that she was aware of; and that appellant said that Carol would come around naturally. Carol testified, as hereinabove stated, that appellant inserted the prongs into Carol's private parts. After she so testified, she was asked, "*Then* what did she [appellant] do?" Carol answered, "I don't know. I could not see." It thus appears that the statement that she "could not see" (referred to in appellant's argument) related to what was done *after* the prongs were inserted. The other statements in appellant's above-mentioned argument (to the effect that she was not aware of anything, nor did she feel anything, nor was she aware that appellant inserted anything) related to testimony of Carol as to *what else* appellant did after inserting the prongs. After Carol had testified that the prongs were inserted, she was asked: "Now, would you describe *what else* the defendant did at that time that you were speaking about." (She had been speaking about the time she was in the bedroom.) In response to that question she said she was not aware of what appellant did. Then in response to two questions as to whether she felt anything or whether she was aware of anything being inserted, she answered in the negative. It is apparent that said other statements in appellant's argument, as to not feeling or being aware of anything, related to not feeling or being aware of anything *else* (such as the paste or tube) after the prongs were inserted. As above shown, there was other testimony of Carol to the effect that, immediately after she entered appellant's house and was introduced by Johnson to appellant, the appellant directed her to go with appellant to the bedroom; that immediately after she was in the bedroom, the appellant told her to remove part of her clothes and lie on the bed; soon after she complied with appellant's directions, the appellant left the room and returned with a tube, some paste, and some prongs; Carol said she was pregnant and wanted to lose the baby; appellant said that she could not guarantee when it would happen but it would come around naturally; immedi-

ately thereafter Carol and Johnson left appellant's house; there was no catheter in her when she went into appellant's house; three days after she left that house she removed a catheter from her private parts; and two days later a fetus came out. The testimony of the prosecutrix (Carol) was not inherently improbable.

Section 1108 of the Penal Code provides: "Upon a trial for procuring . . . an abortion . . . the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence."

In *People* v. *Richardson*, 161 Cal. 552 [120 P. 20], there was a question as to the admissibility of a statement made by defendant to the district attorney prior to the arrest. In that case it was said at page 563: "The point against it [against receiving the statement] appears to be that it was not admissible in evidence 'until after the *corpus delicti* in the case had been proven,' and that the testimony previously given by the woman was not sufficient to prove such *corpus delicti*, in view of the law requiring corroboration of her testimony before a conviction could be had. There is nothing in the point. The law in regard to corroboration (Pen. Code, § 1108) is simply that the defendant 'cannot be convicted upon the testimony' of the woman, unless she is corroborated by other evidence. Her evidence was sufficient proof of the *corpus delicti* to warrant the introduction of evidence of admissions or confessions on the part of defendant for purposes of the necessary corroboration. That the testimony of the woman may thus be sufficiently corroborated by a confession of the defendant to warrant a conviction, is shown by what is said in *People* v. *Josselyn*, 39 Cal. 393, 400."

In *People* v. *Ames*, 151 Cal.App.2d 714 [312 P.2d 111], it was said at page 728: "Surely an abortee may prove the crime itself by her own testimony. It is only when she testifies to the connection of the accused with the crime that she must be corroborated in order to justify conviction."

In the present case, the testimony of the prosecutrix (Carol) was sufficient to prove the corpus delicti. It was not necessary that her testimony be corroborated in order to make that proof, but the appellant could not be convicted upon her uncorroborated testimony.

In *People* v. *Garner*, 60 Cal.App.2d 63 [140 P.2d 146], it was said at page 65: "By the provisions of Section 1108, Penal Code, in a case such as this 'the defendant cannot

be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence.' The defendant himself, may, however be the source of the necessary corroboration. . . .''

In *People* v. *MacEwing,* 45 Cal.2d 218 [288 P.2d 257], which was an abortion case, it was held that ''the tests developed by the courts for determining the sufficiency of corroborative evidence under section 1111 [Penal Code] are equally applicable to section 1108 [Penal Code].'' Section 1111 of the Penal Code, referred to in that case, provides in part: ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. . . .'' It therefore appears that the rule with reference to sufficiency of corroboration under section 1111 (relating to corroboration of an accomplice) is applicable with reference to sufficiency of corroboration under section 1108 (relating to corroboration of an abortee).

In *People* v. *Rokes,* 18 Cal.App.2d 689 [64 P.2d 746], it was held (p. 691) that an admission is sufficient to furnish the corroboration of an accomplice's testimony necessary to sustain a conviction.

In the present case, there was evidence that Officer Mitchell (who pretended to be Carol's brother) stated to appellant that Carol had been brought to appellant's house by Johnson, that appellant had put a catheter in Carol to cause a miscarriage, that the abortion was done improperly, and that they should get their money back. Also, there was evidence that, in reply to said statements, the appellant said that she thought they should be reimbursed but she could not return all the money, and she would have to get in touch with Johnson. She also said that she had received only $75 from Johnson for the abortion. Those statements were sufficient corroboration of the testimony of the prosecutrix. The evidence was sufficient to support the verdict on the charge of committing an abortion.

With reference to the charge of conspiracy, the evidence was sufficient to support the verdict. There was testimony by the prosecutrix as to the acts of Johnson and appellant. There was testimony of Officer Mitchell showing an admission of appellant that she and Johnson had an arrangement with regard to sharing the money that was received for the abortion. There was testimony of Officer Bates that a writing was found in Johnson's office, which writing stated

the surname and the address of appellant. The jury could reasonably infer from the evidence that appellant was a party to a conspiracy to commit an abortion.

Appellant also contends that the court erred in considering the testimony of Cheryl Vance as evidence of conspiracy. It cannot be determined, of course, whether her testimony was considered as evidence that *appellant* was connected with a conspiracy. Johnson was also a defendant and the testimony of Cheryl was admissible with reference to the acts of Johnson. Irrespective of her testimony the evidence was sufficient to support the verdicts as to appellant.

The contention that appellant was twice in jeopardy for the same offense is not sustainable. Appellant argues that there was double jeopardy because she was charged with the crime of conspiracy to commit abortion and with the crime of abortion. In *People* v. *Campbell,* 132 Cal.App.2d 262 [281 P.2d 912], it was said at page 268: "It has long been settled that a conspiracy is a distinct offense from the actual commission of the offense forming the object of the conspiracy and that guilty parties may be legally convicted of both offenses."

Appellant contends further that the court erred "in refusing disclosure of a participant in the alleged conspiracy." The prosecutrix had testified that she was with Les Jones in the bar; she did not know where he lives; and that he had given her some money. Counsel for appellant asked her, as follows: "Q. He just gave you some money? You don't know where he lives? Have you seen him before this December 29th?" The deputy district attorney objected thereto on the ground of immateriality. Counsel for appellant said: "We are entitled to know all persons present so that we can go out and test her credibility. If it is necessary to bring him in, we can." The objection was sustained. (Upon stipulation, the case was submitted upon the transcript of the preliminary examination, with the right to present additional evidence. This present contention is based upon proceedings shown in that transcript.) It is to be noted that the so-called "question" consisted of three questions. It was proper, of course, not to require an answer thereto. Two of those three questions had been answered—that is, she had just answered that Jones had given money to her, and that she did not know where he lives. Even if it be assumed that the court erred in not permitting an answer to the third question (as to whether she had seen Jones before December 29), the error was not

prejudicial. It appears that appellant's witness, Williams, knew Les Jones, and knew that he bought and sold horses, and knew that he was married. Through that information it was reasonable to conclude that appellant could have located Jones. (See *People* v. *Lawrence,* 149 Cal.App.2d 435, 449 [308 P.2d 821].)

Appellant asserts further that section 1324 of the Penal Code is unconstitutional. That section relates to exempting a witness from prosecution under certain conditions. Appellant states in her brief that Carol testified that ''she had signed waiver of hearing for immunity. . . . In effect, she waived issuance of an order under 1324 compelling her to testify. . . .'' Appellant argues to the effect that the state may not single out persons and give them immunity if they testify and deny immunity to others, ''nor may it base that immunity solely upon the fact that they are called as witnesses for the People without giving the same right to the defense.'' A similar argument, with reference to an immunity statute, was made in *People* v. *Fowler,* 119 Cal.App.2d 657 [260 P.2d 89]. It would not serve a useful purpose to restate herein extended portions of that opinion. The said section 1324 of the Penal Code, as applied to appellant's position as shown by the evidence herein, is not unconstitutional.

The judgment and the order denying the motion for a new trial are affirmed.

Fourt, J., and Lillie, J., concurred.